TISDALE *vs.* GRANT and others.

The plaintiff, being the owner of four-fiftieths of a steamboat, of which the defendants owned forty-six fiftieths, which they had purchased from a former part owner, sold his shares to the defendants; representing at the time of the sale, that there were no bills against the boat, except to a small amount, for current expenses, which there were funds enough on board to pay. *Held,* that the plaintiff was forever *estopped* from setting up any claim against the defendants, by way of *lien* upon the boat, for his services as captain thereof, and for moneys advanced by him for seamen's wages, repairs, and supplies prior to the sale to the defendants.

*Held also,* that an agreement, executed by the defendants, at the time of the purchase by them, of the plaintiff's interest in the boat, by which they promised to pay to the plaintiff forty-six fiftieths of *all the liens on the boat existing at that time, and created by act and operation of law,* and held by the plaintiff or others, did not bind the defendants to pay to the plaintiff the amount of the lien thus claimed by him.

The master of a steamboat has no *lien* upon the boat, for the amount of his salary.

THIS action was commenced in August, 1849, and was brought to recover the amount due upon a promissory note made by the defendants to the plaintiff, also for money paid, lent and advanced, and had and received, and for services as captain of the steamboat Francis Saltus, and also to recover the forty-six fiftieth parts of all the liens on the said steamer existing on the 11th of February, 1848, and created by act and operation of law and held by the plaintiff or others. The answer did not put in issue the making of the note, or the agreement to pay said liens, but denied the existence of any such liens.

The controversy before the referee was mainly on the subject of the lien. The referee allowed to the plaintiff above three thousand dollars, for the plaintiff's liens on the boat for captain's wages, seamen's wages, expenses of repairs and furnishing necessaries, prior to the time when the defendants became the purchasers of a part of the boat. The defendants appealed from the judgment founded on this report.

The leading facts were, that on the 31st July, 1845, Allen Comstock, being the owner of the steamer Francis Saltus, sold her by a bill of sale on that day to the plaintiff and one Charles

Tisdale *v.* Grant.

W. Kellogg, for the sum of forty-five thousand dollars. It was admitted that Kellogg became the owner of $\frac{46}{50}$ths, and the plaintiff of the remaining $\frac{4}{50}$ths of the boat. They soon after commenced business with her as a freight and passenger boat on Lake Champlain, and continued this business until the 25th day of June, 1847. On this latter day Kellogg conveyed his undivided $\frac{46}{50}$ths of the boat to the defendants. From this day, during the remainder of the season of 1847, the plaintiff and the defendants continued to run her as a freight and passenger boat; the plaintiff still acting as master, and receiving the whole earnings of the boat, and paying from time to time divers sums to the defendants. On the 11th February, 1848, and before the commencement of navigation that year, the plaintiff sold and conveyed his four-fiftieths of the vessel to the defendants, for the sum of two thousand dollars, who thus became the sole owners of the boat. The note for which in part this action was brought, was given for the consideration money. At the time of this sale the plaintiff claimed a lien on the defendants' share of the boat, for his wages as master; during the time she was owned by himself and Kellogg, for the wages of hands employed during the same time, and for supplies which he had furnished for the vessel while he and Kellogg owned her, and for all of which he had paid. This claim was denied by the defendants. To settle this claim so that the rights of both parties might be preserved, the following paper, set forth in the complaint, was executed by the defendants, viz.

" Having received this day of Henry G. Tisdale, a bill of sale of his part of the steamer Francis Saltus, we, in consideration thereof, agree with the said Tisdale to pay the forty-sixth fiftieths of all the liens on said boat *existing at the time of said sale, and created by act and operation of law,* and held by said Tisdale or others. Witness our hands, 11 Feb. 1848.

GRANT, COFFIN & CHURCH."

The important question in the case was, whether at the time of the said sale to the defendants, on that day, there were any subsisting liens upon the boat *created by act and operation of*

---

Tisdale *v.* Grant.

---

*law*, and held by the plaintiff. The plaintiff did not state in the complaint upon what grounds those liens arose. He styled himself a part owner of the vessel with the defendants. The referee held that the plaintiff and Kellogg were partners, not only in the business of running the boat, but in the boat itself, and that the boat was chargeable, not only in his hands, but in the hands of his grantors, with the general balances that might exist on the 11th February, 1848. He thus allowed to the plaintiff, as before stated, a large sum of money, which the plaintiff, as a part owner of the boat, had paid while he and Kellogg ran the boat together, for the wages of the hands on board, for his own salary as captain, and for the other expenses of the concern. Other facts are stated in the opinion of the court.

*G. Stow*, for the appellants. The plaintiff claims a lien on the Saltus, under the contract of February 11, 1848, on two grounds : maritime law and the law of partnership. I. On the ground of maritime law. The maritime law gives no lien to the master for his wages. Where he has in his hands the freight or earnings of the vessel, he may retain as against the owner, for his wages as master ; but this is a right not founded on maritime lien, but on the right of set-off. He sometimes has a lien on freight, or the earnings, for advances necessarily made, and debts necessarily incurred by him in a foreign port ; but never on either vessel or freight, for his wages. (*Van Bokkelin* v. *Ingersoll*, 5 *Wend.* 334. *Conk. Admiralty*, 78, 79. 3 *Kent's Com.* 166, 3d ed. 1 *Pet. Adm. R.* 223. 1 *Paine's Rep.* 72. *Fisher* v. *Willing*, 8 *Serg. & Rawle*, 118.) Nor had the plaintiff, on the 11th of February, 1848, a maritime lien on the Saltus for moneys paid by him for supplies furnished before the defendants had an interest in her. These supplies were obtained on the credit of the owners, and on time, and were paid for by the plaintiff, after the defendants purchased of Kellogg, and before the agreement of February, 1848, by which the defendants undertook to pay liens. The master, under the maritime law, never has a lien for supplies furnished the vessel in a home port,

Tisdale *v.* Grant.

though paid for by him, except in a case of extreme necessity. (5 *Wend.* 327, 8. 3 *Kent*, 355, 6, 3*d* ed.) This is not affected by the act of congress of 1845. (*Conk. Adm.* 69, 70.) A considerable proportion of these supplies was furnished at Whitehall, where both the owners, Tisdale and Kellogg, resided; and the referee allowed them as liens. No maritime lien can be created when the contract is made with an owner. (*Conk. Adm.* 59.) The master has a lien by the maritime law, for supplies procured by his own money, or on his personal credit, in a foreign port, (5 *Wend.* 324;) but then, to entitle him to such a lien, he must show, of course by proof, such a state of facts as would have justified him in pledging the owner's property to a third person. (5 *Wend.* 328, *per Walworth, Ch.*) 3 *Kent's Com.* 353, 4, 3*d* ed. says it must be a case of unprovided necessity that will authorize the master to hypothecate the ship in a foreign port. The state of facts to give a lien on the ship must be as follows, viz. (1.) The supplies or repairs must be furnished in a foreign port; or if in a domestic one, it must be a case of extreme necessity, not allowing an opportunity of communicating with the owners. (3 *Kent*, 355, 6, 3*d* ed. 5 *Wend.* 328.) (2.) The supplies, &c. must be necessary to the prosecution of the voyage, or the safety of the ship. (*Id.* 323.) (3.) There must be a want of means, since, if he can pay by the ship's earnings, or other means, there is no unprovided necessity for giving a lien on the ship. If he has no funds of the owner, it is his duty to obtain supplies on the owner's credit, if possible, before he is justified in allowing a lien to be created. In some cases he must first advance his own money; in which case the marine law gives him security by a lien. Nothing is proved here to show that the supplies, &c. were not furnished on the credit of the owners. That is the legal presumption. (4.) And, finally, a lien can not be created by the master for supplies, where the owner resides, or has an agent or consignee; since if either is where he can act or be communicated with, there is no unprovided necessity for the master's acting at all. (3 *Kent's Com.* 353 *to* 356. 5 *Wend.* 323.) (5.) And it is incumbent on the party claiming the lien to prove this state

Tisdale *v.* Grant.

of facts. (3 *Kent's Com.* 162, 3, 170, 171, 3d ed. 5 *Wend.* 328, *per Walworth, Ch.*) There was no such proof in this case, and the referee erred in deciding that these supplies were liens on the vessel. As the master, as such, has no power to contract for supplies, to be a lien on the vessel, in a place where there is an owner, or agent, it follows that he can not contract as master when he is a part owner. He must contract as part owner. In this capacity he acts for himself and as a simple common law agent of the other part owner. He may undoubtedly give a lien to others by hypothecating the vessel, in a case of necessity, or he may personally bind himself and the other part owner by his contract; but when he pays the lien or pays money to discharge their joint obligations, he pays as part owner, and is only entitled to the remedy of one. Hence, it has been held by a long series of decisions, without an exception to disturb its uniformity, so far as I know, that one part owner of a vessel has no lien on the share of another for advances made on a voyage, or for a general balance of accounts. This was distinctly decided in *Braden* v. *Gardner*, (4 *Pick.* 456;) *Patton* v. *Randolph*, (*Gilpin*, 457;) *Nicoll* v. *Mumford*, 4 *John. Ch. Rep.* 526;) *Ex parte Young*, (2 *Ves. & B.* 242;) 2 *Rose*, 78, *in note; Ex parte Harrison*, (2 *Rose's Cases in Bankruptcy*, 76;) *Ex parte Gibson*, (1 *Mont. on Part.* 102, *in note;*) *Curtis' U. S. Digest*, Lien, p. 789; 3 *Mason*, 255. And Abbott in his work on shipping, (*part* 1, *chap.* 3, *sec.* 8, *title Part owners*, 3d *Am. ed.*) says: "But as one part owner can not compel another to sell the ship, there does not appear to be any mode by which he can enforce against the other's share of the ship, in specie, the payment of his part of the expenses." There would be a mode, however, if one of them could have a lien on the other's share of the vessel. And it has been decided that where two persons build a ship together, to be owned by them in certain propor tions, and one advances more than his proportion of the expenses he has no lien on the ship for the balance due him. (*Merrill* v. *Bartlett*, 6 *Pick.* 46. *Curtis' U. S. Digest*, Lien 1, *sec.* 17 *See also Curling* v. *Robertson*, 8 *Scott, N. R.* 12, 13; *English Law Jour. N. S.* 137; 5 *Har. Dig. Suppl.* 1626; *Helme* v.

*Smith*, 5 *Moore & P.* 744; *Ex parte Young*, 2 *Ves. & B.* 242; *Ex parte Harrison*, 2 *Rose*, 76; *Conk. Admiralty*, 248, 249, *&c.*) These cases decide that persons owning shares in the same vessel, and employing it for their joint benefit, are part owners or tenants in common of the vessel, while they are partners as to the freight and other earnings, and have no lien on each other's shares of the former. The cases show, too, that where one of the owners becomes bankrupt, his assignees take no interest in the vessel, except the bankrupt's undivided share, and have no lien on the co-tenant's share for supplies furnished, whatever may have been the state of the accounts between them, even where the bankrupt has acted as ship's husband as well as part owner. Part owners are liable, as partners, for repairs and necessary expenses of the ship, though they are only tenants in common of the vessel itself. (3 *Kent's Com.* 156, 3d ed.) Debts contracted for such repairs and supplies, therefore, are the debts of each, as well as both. The debts contracted for the repairs and supplies of the Saltus were then the personal debts of Tisdale the plaintiff; and by afterwards paying, he extinguished them. Is it not absurd to hold that Tisdale has a lien on our property, because he has paid his own debt? Suppose the persons making the repairs or furnishing supplies to have had liens, and they had instituted proceedings *in rem* against the vessel, and we had been forced to pay them, can there be a doubt that the defendants could sue Tisdale and Kellogg for money paid to discharge their debts? A lien, wherever one exists, is but an incident of a debt. Where the debt is extinguished, the lien is necessarily extinguished. By paying the debts contracted for repairs and supplies, Tisdale necessarily destroyed the lien, had there been one. Is it not absurd to hold that the incident remains after the extinction of the principal? If it be urged that Tisdale, by paying the debts for repairs and supplies, became substituted to the lien of the persons furnishing the repairs, I answer, (1.) No state of facts is proved to show that even they had a lien. It was the duty of Tisdale to obtain the repairs and supplies, if possible, on the personal credit only of the owners, without giv-

Tisdale v. Grant.

ing any lien. *Non constat*, he did so. (2.) Tisdale was incapable of being substituted to such lien, since, being owner, the lien would merge. (3.) He is also incapable of being so substituted, on the ground of public policy. Such a power would be liable to great abuse. So jealous is maritime law of such abuses, that it will not allow one part owner who advances money to the master, for even necessary repairs, and in a foreign port, to take a bottomry bond of the master, giving him a lien on the vessel. (*Patten v. Randolph, Gilpin*, 457.) The case, too, is authority to show, that where there is a union of the characters of master and part owner, there can be no lien on the vessel; since it shows that it was an unavailing attempt by a part owner to gain a lien by taking a bottomry bond, where he could not have had one by simply paying his money for the repairs. Had the party in that case been capable of having a lien, the fact that he had advanced money for necessary repairs, and in a foreign port, would have given it to him, though the bottomry bond had been void. By the maritime law liens must be enforced in a reasonable time. (*Conk. Admiralty*, 60.) It is insisted by the plaintiff's counsel that the doctrine of the case of *Nicoll v. Mumford*, (4 *John. Ch. Rep.* 522,) decided by Chancellor Kent, and referred to above, has been shaken, if not overturned, by the court of errors, in the same case. (20 *John.* 611.) Judges Platt, Woodworth and Spencer only gave written opinions; and no vote was taken on any distinct legal proposition. The decision, though it settled the rights of the parties litigant, is worth but little as authority, for that reason. It does not, I conceive, at all impugn the doctrine laid down by the chancellor. It does not decide that part owners of a vessel are not tenants in common. It does not decide that part owners, as such, have mutual liens upon each other's share. The case simply decides that the law of partnership was applicable to it, because it was in fact a case of partnership, and that the error of the chancellor was in applying to it the law of part owners. Platt, who was for affirming the chancellor's decree, says, (p. 621,) "According to my judgment, upon the evidence, the brig was not sent abroad to be sold." Had the brig as well as the cargo

Tisdale *v.* Grant.

been sent abroad to be sold and the proceeds invested in a new adventure, it was admitted, and can not be denied, that it would have been a clear case of partnership; and the remark of the judge shows, that that was made a question. Woodworth, J. says, (page 625,) "One principal object connected with that was, that both vessel and cargo should be sold;" and on page 628, he adds: "is it admitted that here the parties were partners in the cargo and voyage; Is it not equally clear that they are so in the vessel? It is not the case of a vessel being chartered or earning freight, *eo nomine ;* but the vessel is to be sold as well as the cargo; the avails of both are to be invested in such manner as the master may consider most advantageous." And Spencer, J. on page 632, says: "There is no complaint of the sale of the brig, which was made in pursuance of instructions originally given, and which never were revoked;" and he states the question in the case thus: "In short, under the facts and circumstances of this case, are the proceeds of the vessel to be regarded as partnership property?" And lest the ground of his opinion should be mistaken, lest he should be considered as overturning settled distinctions between partners and part owners, he adds, on page 635, "I must not be supposed to overrule the distinction between partners in goods and merchandise, and part owners of a ship. The former are joint tenants, and the latter are, generally speaking, tenants in common; and one can not sell the share of the other. But, I mean to say that part owners of a ship may, under the facts and circumstances of this case, become partners as regards the proceeds of the ship; and if they are to be so regarded, the right of one to retain the proceeds, until he is paid what he has advanced, beyond his proportion, is unquestionable." It will thus be seen that both Judge Woodworth and Judge Spencer, who were for reversing the chancellor's decision, seize upon the fact that the vessel as well as the cargo was to be the subject of trade for profit, as distinguishing the case from part ownership, and giving it the character of a partnership. The principle is undoubtedly correct, and is as applicable to real estate as to vessels. The decision by the court of errors in no wise overrules the doctrine of the

Tisdale *v.* Grant.

chancellor, but confirms it. It only establishes that his doctrine was not applicable to the case. In the present case the vessel was not to be made the subject of traffic; it was to be employed as the instrument of gain for their joint benefit, as in the ordinary cases of part ownership and tenancy in common. There is nothing to distinguish it from such cases—nothing to take it out of the general rule. And to maintain their claim to a lien, the opposite counsel must establish that part ownership in a vessel is *ex vi termini* a partnership, which would overturn every case which has ever been decided on the subject, and even that of *Doddington* v. *Hallett*, on which they rely.

II. As to partnership liens. Partnership liens are not comprehended within the scope of the agreement of February 11, 1851. The agreement is to pay such claims as were liens on the vessel "by act and operation of law." The employment of the words, "by act and operation of law," shows that there were liens in the minds of the parties, which were not created by act and operation of law; and that all such liens were intended to be excluded from the contract. If the agreement comprehends all liens, usually so called, then the words which the parties obviously intended as a limitation have no force or meaning. The words doubtless were intended to include all liens by act and operation of the marine law, and by act and operation of the common law, and to exclude all others; marine liens, and technical common law liens, as contra-distinguished from equitable liens, or claims enforced as liens in chancery. What is called a partnership lien, is in fact no lien; and it is called such, only because it has substantially the same effect in equity that a lien has at law. It is a simple preference given in equity in the order of disposition of the partnership funds. Judge Story treats of partnership liens as belonging to the classification of trusts. By the common law, each partner is seised of the whole of the partnership property. Equity steps in and holds him seised in trust for the benefit of the creditors of the partnership, and, secondly, for the benefit of the partner to whom the firm shall be indebted—thus giving him a preference in the distribution of the partnership funds over the debtor partner, and the debtor

partner's separate creditors. The effect of this preference, and this law of trusts, as it is analogous to a lien, so it is more conveniently expressed by the word lien; and hence only its frequent but erroneous use among lawyers. As an example of the erroneous but innocent use of the word, Chancellor Walworth, in several cases before him, speaks of a creditor's gaining a lien on his debtor's property by having an execution against him returned *nulla bona.* No harm is done by the use of the word, so long as we understand what it means. But this is the first time I have known a party claim a substantial right founded upon a mere erroneous definition. A strict lien is neither " *a jus ad rem,*" nor " *a jus in rem ;*" that is to say, it is neither a right *to* the thing, nor a right *in* the thing. (*Cross on Liens,* 198. *Ex parte Ruffin,* 6 *Vesey,* 119.) This can not be said of partnership preferences or liens; since each partner has, as such, both a right to and in the property to which the preference is given. (1 *Meeson,* 319. *Story's Equity.*) Conceding, for the sake of the argument, that the vessel was partnership property, Tisdale has not proved enough to entitle him to a partnership lien. Partnership liens never exist, but as security for balances. Story says : " The lien of partners upon the funds of the partnership is for the balance finally due to them respectively." (2 *Story's Part.* § 645. *Hodges* v. *Holman,* 1 *Dana,* 50.) To show himself entitled to a partnership lien, he must show that he is entitled to a balance from the partnership funds. Proving a balance is indispensable to establish the lien. There is no evidence to show that any balance whatever is due to Tisdale from Kellogg, on a settlement of their partnership concerns. The interest which is proved is, that Tisdale was to wait the event of the battle for his wages. *Non constat* that the battle went against him, and nothing was left to pay them. Kellogg made the principal advances, and furnished the principal supplies, and for any thing appearing in proof, Tisdale may be indebted to him in a large amount. There may have been great losses and great liabilities for damages. Kellogg swears there has been no settlement between them. Tisdale is estopped from setting up any lien, if he had one, by what occurred on the

Tisdale *v.* Grant.

boat when Kellogg delivered her, in the presence of Tisdale, to Church.

*D. L. Seymour*, for the respondents. I. There is no dispute repecting the charges proved for money due on the note of $2000, and the several receipts for cash proved; nor the wages and expenses of the plaintiff in the season of 1847, after 25th June, in running the boat, nor the damages allowed the plaintiff for loss of employment as master of the Francis Saltus in the season of 1848.

II. The defendants are, by the terms of their contract, liable for *liens* existing by act or operation of law on the steamer Francis Saltus, whether held by the plaintiff or any other person on the 11th of February, 1848. The word " law " in this contract is used in its most extensive sense, and embraces equitable and maritime as well as legal liens. The general definition of lien is, " a lien is simply a right to possess and retain property, until some charge attaching to it is paid or discharged," &c. (1 *Story's Jur.* 29, § 506.) By the act of congress, passed February 26, 1845, (*Laws of U. S.* 1845, *p.* 12, *ch.* 20,) the jurisdiction of the United States courts was extended to "all matters of contract and tort arising in, upon or concerning steamboats," &c. enrolled and licensed for the coasting trade, and at the time employed in the business of commerce and navigation between ports and places in different states and territories upon the lakes, and navigable waters connected with said lakes, as is now possessed and exercised by the said courts in cases of the like steamboats and other vessels employed in navigation and commerce upon the high seas or tide waters within the admiralty or maritime jurisdiction of the United States ;" * * * " and the maritime law of the United States, so far as the same is or may be applicable thereto, shall constitute the rule of decision in such suits, in the same manner and to the same extent, and with the same equities as it now does in cases of admiralty and maritime jurisdiction." The statute saves then the rights of parties to a trial by jury, and any concurrent remedies at common law or by statute. (*See Laws of U. S.* 1845. *Constitution of*

*U. S.*) The steamer Saltus, navigating Lake Champlain in 1845, 6 and 7, and enrolled and licensed as she was at the port of Plattsburgh, was subject to this law. And, *first,* she was therefore, liable to the lien of *seaman's wages.* Of this lien Chancellor Kent says: " It does not, like other liens, depend upon possession. * * It follows the ship and its proceeds into whose hands soever they may come, by title or purchase from the owner. Their demand for wages takes precedence of bottomry bonds, and is preferred to all other demands, for the same reason that the last bottomry bond is preferred to that of a prior date. Their claim is a sacred lien, and as long as a single plank of the ship remains, her sailor is entitled as against all other persons to the proceeds as security for his wages ; for by their labor the common pledge of all her debts is preserved." (3 *Kent's Com.* 197. *Shepherd and others* v. *Taylor and others,* 5 *Peters' U. S. Rep.* 675, 710 *to* 712.) *Secondly.* All repairs and necessaries furnished the ship in the ports of any other state than that to which she belongs, were liens under this law. (3 *Kent's Com.* 170. 9 *Wheat.* 409.) And in 6 Dana's Ky. Reports, the court held any port to be a foreign port, " where the vessel and its owner are not together." The supreme court of the United States has held a port in another state of the United States was not as it respects this rule, a home port. (*See note to* 3 *Kent's Com,* 170, *n. e. 6th ed. Cutter* v. *Rea,* 7 *How. U. S. Rep.*) As to repairs and necessaries furnished in the port or state where the vessel belongs ; the lien is not implied by the maritime law, but is created by the local state law. (3 *Kent's Com.* 170. *Conk. Admiralty,* 57.) It will be seen, therefore, that in American courts of admiralty, suits *in rem* may be maintained by material men. 1. In the case of foreign ships, including ships belonging to other states, these being regarded as foreign. 2. In the case of domestic ships, where repairs have been made or supplies furnished out of the state to which the vessel belongs. 3. In the case of domestic ships obtaining repairs or supplies in a home port, provided the local law gives a lien therefor. In *Waring and others* v. *Clark,* (5 *How. U. S. Rep.* 241,) the court held that " admiralty jurisdiction in the

Tisdale *v.* Grant.

courts of the United States is not taken away because the courts of common law have concurrent jurisdiction in a case with the admiralty ; nor is a trial by jury any test of admiralty jurisdiction. The subject matter of the contract or service gives jurisdiction in admiralty ; locality gives it in tort." All these claims therefore for mariners' wages, expenses of repairs, victualing and running the boat, were liens on it by the maritime law, and the plaintiff having paid them as master and part owner, while in the possession and charge of the boat, had himself a lien upon the boat for the amount so paid, over and above his share thereof. As ship's husband, and part owner and quasi partner, he had also a lien thereon for the unpaid balance of wages as captain of the boat, both while running her with Kellogg and with the defendants. By the continued possession of the boat from July 1845, to February 11, 1847, he continued to hold those liens until then, when their payment was provided for by the contract of that date. (*Story on Part.* 279, § 182, *and cases cited in note* 1. *Bradford* v. *Kimberly,* 3 *John. C. R.* 431, *&c.*) As to captain's wages, see *Story on Part.* § 418, *note on page* 588, §§ 441, 443, 444; *Story's Eq. Jur.* §§ 1240 *to* 1242, *inclusive* ; *Mumford* v. *Nicoll,* (20 *John.* 611 ;) *Phillips* v. *Purington,* (15 *Maine R.* 425 ;) *Harding* v. *Foxcroff,* (6 *Greenl.* 77 ;) *Lamb* v. *Durant,* (12 *Mass.* 54.) 2 *Hill, S. C. Ch.* 555 ; *Seabrook* v. *Rose, cited in Abbott on Ship.* 125, 7*th Eng. ed. ;* 3 *Kent's Com.* 154, 5*th ed.*) Part owners may, under the facts and circumstances of the case, become partners as regards the proceeds of the ship ; and if they are so to be regarded, the right of one to retain the proceeds until he is paid what he has advanced, beyond his proportion, is unquestionable. The plaintiff and Kellogg were partners, as regards the vessel and her business ; and the plaintiff had a lien thereon for his wages and advances for the vessel and its business, over and above his share. (*Story's Eq. Jur.* § 1236.) An equitable lien arises in those cases where a person is entitled to be reimbursed for repairs and improvements of property, both real and personal, and in this respect its application is more extensive than a legal lien.

In this view it is applied to ships and all disbursements in reference to them, both in the civil and the admiralty law.

III. On the 25th June, 1847, the defendants purchased Kellogg's interest in the boat ; that interest was all that would remain to him after all these claims and charges were paid. They made this purchase with notice, or with such knowledge as should put them on inquiry. See letter dated October 14, 1847, and the notorious fact of the manner in which the boat was employed. Besides, the agreement itself, of February 11, 1848, waives notice ; its language is "*all the liens.*" The plaintiff on the 11th February, 1848, claimed to hold the boat as joint owner, for the payment to him of salary as master, moneys which he had paid for mariners' wages, and for wood and other supplies for the boat, and parted with possession of the boat only upon the defendants' contract to pay their share of these claims. Hence, even if the plaintiff had received the earnings of the boat after June 25th, 1847, the referee was correct in not charging the plaintiff with so much of the earnings of the boat as he had applied to extinguish those claims on the boat accruing prior to June 25, 1847, and said to amount to $2586,17, and was also correct in allowing as liens held by the plaintiff on the boat on February 11, 1848, the balance of the plaintiff's wages $2752,70, and $424,03, the balance of expenses in running the boat after Jan. 25, 1847.

WILLARD, P. J. If the plaintiff and Kellogg were merely part owners of the steamer Francis Saultus, and she was not a portion of their partnership stock or capital, there can be no ground for upholding a lien on the boat in favor of the plaintiff against the defendants, for the charges which accrued while the plaintiff and Kellogg were owners. The general relation between ship owners is that of part owners, and not partners. Part owners are tenants in common, and not joint tenants. Each has his distinct, though undivided interest. No one can dispose of the interest of the other. (*Story on Part.* § 417.) It is otherwise with respect to partners ; each can dispose of the entire subject, (3 *Kent's Com.* 153 ;) but the assignee takes subject to all partnership accounts. (*Nicoll* v. *Mumford*, 4 *John.*

Tisdale v. Grant.

*Ch. Rep.* 522.) The assignee of the part owner of a vessel is entitled to his part, or the proceeds thereof, without being subject to any general balance of account between the owners. (*Ib. Collyer on Part.* 666, 687. *Mulden* v. *Whitlock,* 1 *Cowen,* 290.)

With respect to partners, it may be laid down as a general principle, that each of the partners has a *specific lien* on the partnership stock, not only for the amount of his share, but for moneys advanced by him beyond that amount, for the use of the copartnership. (*Coll. on Part.* 65. *Story on Part.* § 441.) In *Dodington* v. *Hallet,* (1 *Ves. sen.* 407,) Lord Hardwicke extends this doctrine to part owners of ships, holding in a case where one of several part owners died without paying his portion of the expense of building and fitting out a ship, that the other part owners had a specific lien on his share, for the moneys which they had laid out on his account. But Lord Eldon, after great consideration, overruled this decision of Lord Hardwicke, being of opinion that part owners of a ship, being tenants in common and not joint tenants, have not by analogy to partners, a lien on the shares of each other. (*Ex parte Young,* 2 *Ves. & Beame,* 242. *Ex parte Harrison,* 2 *Rose,* 76. *Coll. on Part.* 666, *a.*) Judge Story gives his preference to the doctrine laid down by Lord Hardwicke, as most consonant to equity, and as founded in principle, public policy and convenience. He treats cases of this sort as a species of partnership, with reference to the adventure upon which the ship is to be employed; and, therefore, the repairs, outfits and other expenses incurred to accomplish the enterprize, are deemed to be made on joint account, and intended to be governed, as to rights and liens, by the rules of strict partnerships. (*Story on Part.* § 444.) Chancellor Kent followed the rule of Lord Eldon in *Nicoll* v. *Mumford,* (4 *John. Ch. Rep.* 522,) but his decree was modified by the court of errors, and the rule adopted by Lord Hardwicke was sustained. (20 *John. Rep.* 611, *same case.*) Ch. J. Spencer, in delivering the prevailing opinion in the court of errors, said, that he did not intend to overrule the distinction between partners in goods and merchandise and part owners of a ship. The former are

joint tenants, and the latter are, generally speaking, tenants in common; and one can not sell the share of the other. "But I mean to say," he observes, "that part owners of a ship may, under the facts and circumstances of this case, become partners as regards the proceeds of the ship; and if they are to be so regarded, the right of one to retain the proceeds, until he has paid what he has advanced, beyond his proportion, is unquestionable." In that case the question arose between the part owner, who had made the advances for outfits, repairs and expenses, and received the whole avails of vessel and cargo, and the assignees under the insolvent act, of the other part owner. There was a strong equity in favor of treating the vessel as well as cargo as the partnership stock, and thus enabling the part owners, by whose means the fund had been acquired, to be reimbursed, before the creditors of the insolvent part owner could be permitted to come in for a share.

The case of *Dodington* v. *Hallet,* (*supra,*) before Lord Hardwicke, presented an equally strong case in favor of the application of the partnership rule. The question did not arise between one part owner, and a purchaser from another part owner, as in this case; but between one part owner and the personal representatives of a deceased part owner. The rule of determination was the same as if both part owners had been before the court, and one prayed an account against the other. Lord Hardwicke held that a ship may be the subject of a partnership, as well as any thing else. And he thought in that case, it appeared plainly there had been a partnership between the parties.

The present case differs widely from *Dodington* v. *Hallet* and *Nicoll* v. *Mumford.* The question here arises between the plaintiff, a former part owner, and his own vendee, who was also the purchaser from the other part owner. There is no evidence that the boat was the subject of the partnership between the plaintiff and Charles W. Kellogg, from whom the defendants purchased. The defendants purchased not a share in a partnership, but the forty-six-fiftieths of a steamboat. They took the delivery of it in presence of the plaintiff; and the latter was

expressly asked if there were any bills against the boat, and he replied that there were none, except to the amount of two or three hundred dollars for current expenses, and that there were funds enough on board to discharge those bills. After such a declaration, under such circumstances, he should be forever estopped from setting up any claim by way of lien. It is precisely one of those cases where the doctrine of estoppel *in pais* applies. The representation of the plaintiff, in effect that the boat was unincumbered, influenced the conduct of the defendants in completing the purchase. They had a right to act upon it; and whether true or false, the plaintiff should not now be permitted to controvert it. (1 *Cowen & Hill's Notes,* 200, *et seq. where many of the cases are collected.*)

In determining whether the plaintiff has a specific lien on the boat, for the charges in question, we have a right, also, to consider the special circumstances of the case, in order to determine the equities between these parties. This was done by Lord Hardwicke, in *Dodington* v. *Hallet,* and by Ch. J. Spencer, in *Nicoll* v. *Mumford.* The boat in question was purchased by the plaintiff and Kellogg, in July, 1845, for forty-five thousand dollars. She was run about three years at a disastrous loss to the parties, when in February, 1848, the defendants, having previously acquired Kellogg's share, became the purchasers of the plaintiff's four-fiftieths, for two thousand dollars. At this rate the value of the boat must have depreciated to twenty-five thousand dollars. There is no evidence in the case that the sum given by the defendants was less than the fair value of the plaintiff's share of the boat. And yet it was attempted before the referee to make the defendants chargeable with liens upon the boat to the amount of over thirty-six hundred dollars; and thus show that they had agreed to give for the four-fiftieths of the boat the sum of $5600 and upwards. If four-fiftieths of the boat was worth $5600, the whole boat was worth $70,000; a sum of $25,000 beyond her value three years before, and probably $50,000 beyond her value at that time. It can not be believed that the defendants, when they purchased of the plaintiff in February, 1848, dreamed of a lien that nearly twice exceeded

the purchase price of the plaintiff's share of the boat. This consideration alone is enough to repel every notion of a lien. It was not in the contemplation of the defendants, and but feebly asserted by the plaintiff. The agreement given by the defendants on the 11th of February, 1848, was a harmless way of submitting the legality of the demand to the decision of the courts.

If this controversy was between the plaintiff and Kellogg, for an account, the question would assume a different aspect. If the plaintiff, as between him and Kellogg, is entitled to be reimbursed for large advances, his remedy is against the latter in person. The circumstances under which the defendants became the purchasers from Kellogg, deprive the plaintiff of every pretense of justice for seeking to charge the defendants with a portion of the losses sustained by the plaintiff and Kellogg, while they ran the boat.

The liens intended to be provided for by the agreement of the 11th of February, 1848, are only such as were created *by act and operation of law,* and held by the plaintiff; and which were existing at the time of the said sale. This agreement may be satisfied by restricting it to such liens as were created by act and operation of law during the time that the plaintiff and defendants were running the boat together. For that period the plaintiff is not concluded by what passed between him and the defendants when they purchased from Kellogg and took the delivery of the boat. Whether any lien had been so created, while they ran the boat, would depend upon the facts in the case, as to whether they were in partnership in the boat or not, and the like. It is quite possible that the defendants might be chargeable for liens created during that time; but it is unnecessary to decide it, because the proof may be different on another trial. The referee having mingled this period with that preceding it, when the plaintiff and Kellogg ran the boat, his decision must be reversed, and the case sent back for another hearing.

It is worthy of observation, that it no where appears how much the defendants paid or agreed to pay Kellogg for his

Tisdale *v.* Grant.

share of the boat. The witness Kellogg, in speaking of his sale to the defendants, uses indiscriminately the terms, "that he sold the boat," and that he had "sold his interest in the boat." If he merely sold *his interest in the boat subject to an account*, the defendants have no ground to complain of the decision of the referee. Express evidence to that effect would repel the estoppel urged by the defendants against the plaintiff. It would be an estoppel against an estoppel, and thus leave the matter at large. If he sold the boat as *part owner*, a different consideration would arise, with respect to the plaintiff's remedy for his antecedent advances. As the general rule requires us to treat part owners as tenants in common, and as those who seek to make a case of partnership of the transaction must establish the fact by affirmative evidence, it would have been well, if the inquiries had been pursued further as to the nature and character of the defendant's purchase from Kellogg. Was the contract by which they purchased, in writing? Did they purchase the boat as part owners, or did they purchase Kellogg's interest, subject to an account? And bearing on both questions, how much did they give, and in what manner were they to pay? This feature of the case is remarkably bald in its circumstances. It is desirable, and, perhaps, essential to the justice of the case, that we should know more of the facts.

Again; it was urged that the plaintiff was entitled to recover on the ground of maritime lien. It is quite clear that as master he had no such lien on the boat for his own salary. (3 *Kent's Com.* 166.) As nearly all the sum allowed to the plaintiff was for the captain's salary, and as the referee did not justify its allowance on the ground of maritime lien, but on the principle of partnership, it seems needless to review the argument on this branch of the case.

The judgment should be reversed, and a new trial ordered before the same referee, with costs to abide the event.

CADY, J. The plaintiff claimed that he had a lien on the boat for his wages as master, and for all his disbursements for seamen's wages and other expenses incurred in the management

of the boat from the 31st of July, 1845, until the boat was sold by the defendants. If he had such lien, no objection can be made to the report. If he had no such lien, the report must be set aside; as the greater part of the report is to satisfy that lien.

The plaintiff and Charles W. Kellogg owned the boat as part owners, or as partners, and the plaintiff was master of the boat, and the understanding between him and Kellogg was that he should have a compensation for his services as master. And if, on the 11th day of February, 1848, he had a lien on the boat for his wages as captain, while he and Kellogg owned the boat, then the motion to set aside the report must be denied; if not, it must be granted. It is well settled that a master has no lien on the ship, for his wages. (3 *Kent's Com.* 165 *to* 169.) "He is considered as contracting personally with the owner." If the plaintiff and Charles W. Kellogg were part owners, or tenants in common, of the boat, the plaintiff must be understood as relying upon the personal responsibility of Charles W. Kellogg for forty-six fiftieths of his wages, as master. The evidence is very strong that the plaintiff and Kellogg regarded themselves as owning the boat as tenants in common, and not as partners; one purchased forty-six fiftieths, and the other four fiftieths of the boat. Neither of them ever claimed the right to sell the whole boat. Kellogg sold his forty-six fiftieths of the boat to the defendants. It is not a usual thing for a partner to sell an undivided part of a piece of property belonging to the firm. The defendants must have supposed that the boat belonged to the plaintiff and Kellogg as tenants in common, or they probably would not have purchased an undivided part of the boat from Mr. Kellogg. The plaintiff was informed that Kellogg had sold his interest in the boat. He expressed no surprise that he had sold a part and not the whole. He did not object to Kellogg's delivering to the defendants forty-six fiftieths of the boat. He set up no claim to a lien on the boat. From the evidence in the case I should have found that the plaintiff and Charles W. Kellogg owned the boat as tenants in common, and not as partners, and that the plaintiff had no lien on the boat for his

wages. The referee, however, has decided that they owned the boat as partners; and assuming that his finding must be conclusive upon that question, then the inquiry will be, had the plaintiff, on the 11th of February, 1848, a lien on the boat, for his wages as captain, from the 31st of July, 1845, to the 27th of June, 1847

A partner is entitled to no compensation for his services, without an express stipulation to that effect; and when there is such a stipulation he must rely upon that. (*Bender* v. *Bender*, 18 *Vesey*, 172.) In this case Charles W. Kellogg proved that the understanding between him and the plaintiff was that the plaintiff should have a fair compensation for his services. The amount was not agreed on. The boat was managed for the benefit of the plaintiff and Charles W. Kellogg as partners, and the compensation due to the plaintiff for his services, was a debt against the firm. What was his remedy for that debt? He might have filed a bill against his partner, for an account, and to be paid that debt out of the partnership funds. And if those funds were insufficient for that purpose, he might have compelled his partner to pay forty-six fiftieths of the deficiency; or he might have sold any of the partnership property, and retained the proceeds to pay himself. Or, if he had any partnership property in his hands, he might have retained it until his debt was paid. In Story's Equity Jurisdiction, § 506, it is said that "A lien is not in strictness either a *jus in re* or a *jus ad rem*, but it is simply a right to possess and retain property until some charge attaching to it is paid or discharged." And in § 1243, it is said "Another species of tacit or implied trust, or, perhaps, strictly speaking, of tacit or implied pledge or lien, is that of each partner in and upon the partnership property, whether it consists in bonds, or stock, or chattels, or debts, or his indemnity against the joint debts, as well as his security for the ultimate balance due to him for his own share of the partnership effects." This right of one partner to look to the partnership funds as an indemnity against the debts of the firm, and as his security for the balance which may be due to him, must be so understood as to be consistent with the rights of the other partners, and of

third persons who may purchase any of the partnership prop- erty. One of the absolute rights of each partner is to sell any of the partnership property, and give a perfect title thereto, and the creditor partner can not follow that property into the hands of a purchaser, under the claim that the firm was indebted to him, when the property was sold. When one partner sells the property of the firm, with the knowledge of the other partner, who does not object at the time, he can not be allowed to im- peach the sale afterwards. In this case, say the boat was part- nership property. Charles W. Kellogg, one of the partners, sold forty-six fiftieths of the boat to the defendants; he went upon the boat with one of the defendants, informed the plaintiff of the sale, and in his presence, so far as it could be done, de- livered possession of the forty-six fiftieths to the purchasers. The plaintiff made no objection to the sale. He set up no claim to a lien for wages. The possession of forty-six fiftieth parts of the boat was changed, with the assent of the plaintiff; and he afterwards recognized the defendants as the owners of forty-six fiftieths of the boat. And if the boat had before been the part- nership property of the plaintiff and Charles W. Kellogg, the title of the defendant to forty-six fiftieths of the boat was as per- fect and as unincumbered as if the plaintiff had sold that por- tion of the boat to them. I am, therefore, of opinion that whether the boat was partnership property, or whether it was held by the plaintiff and Kellogg as tenants in common, the plaintiff had no lien on the boat, on the 11th day of February, 1848, for any matter or thing which he did while he and Charles W. Kellogg owned the boat; and that the report should be set aside, and the cause referred back to the referee.

HAND, J. concurred.

*Judgment reversed.*

[SARATOGA GENERAL TERM, January 5, 1852. *Willard*, *Hand* and *Cady*, Justices.] —